UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O
JS - 6

**CIVIL MINUTES - GENERAL**

Case No. SACV 11-0904 DOC                                        Date: April 9, 2012
Criminal Case No. SACR 04-0284 DOC

Title: LORENA COLINO v. UNITED STATES

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

   Julie Barrera                                           Not Present   
Courtroom Clerk                                           Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS: ATTORNEYS PRESENT FOR DEFENDANTS:

NONE PRESENT                                              NONE PRESENT

PROCEEDING (IN CHAMBERS): ORDER GRANTING PETITIONER'S WRIT OF ERROR CORAM NOBIS

      Before the Court is Petitioner Lorena Colino's Petition for Writ of Error Coram Nobis pursuant to 28 U.S.C. § 1651(a) (Dkt. 206) ("Pet.").[1]  The Court finds this matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78; Local R. 7-15.  After considering the moving, opposing, and replying papers, and for the reasons stated below, the Court hereby GRANTS Petitioner a Writ of Error Coram Nobis and vacates her eleven convictions for honest services mail fraud.

      **I.    BACKGROUND**

          **A.    THE INDICTMENT**

      Lorena Colino ("Petitioner") was formerly employed by the Social Security Administration ("SSA").  Pet. at 5.  In 2005, Petitioner was indicted on eleven counts of honest services mail fraud in violation of 18 U.S.C. §§ 1341 & 1346 and one count of lying to a federal agency in violation of 18 U.S.C. § 1001.  Pet. Ex. A.; First Superceding Indictment (Dkt. 58) at 1.  The indictment

---

[1] All references to the docket in this order are to the underlying criminal docket, Case No. SACR 04-0284 DOC.

alleged that Petitioner abused her position with the Social Security Administration by processing and approving social security card applications for illegal aliens who were not entitled to receive social security cards. *Id.* at 2-3. The indictment alleged that Petitioner engaged in this scheme with Ramon Rojas ("Rojas"), a person not employed by the SSA. *Id.* Specifically, the indictment stated:

> (c) Working in concert with defendant ROJAS, defendant COLINO would wrongfully approve and process SS-5 applications for illegal aliens who she knew were not entitled to receive the subject Social Security Cards. Defendant ROJAS would provide defendant COLINO with the name of a card applicant and other information needed to complete an SS-5 application or, in some instances, provide defendant COLINO with completed SS-5 application forms. Defendant COLINO would then falsely note on each such application that the applicant appeared before her and presented verified forms of specified identification.
>
> (d) The card applicants generally were charged approximately $1,300 to $3,000 for each Social Security Card.

*Id.*

Based on that alleged conduct, the indictment charged Petitioner with "execut[ing] a scheme to defraud the United States Government of its right to honest services by means of materially false and fraudulent pretenses and representations and the concealment of material facts" and indicted her on eleven counts of honest services mail fraud in violation of 18 U.S.C. §§ 1341 & 1346. As is apparent from the above-quoted portion of the indictment, the respective roles of Petitioner and Rojas were clearly alleged except as to who charged the applicants the $1,300 to $3,000 fee. The indictment did not allege that Petitioner charged the fee or was aware that the fee was charged. *See* Pet. Ex. A. at 1. The charge of lying to a federal agency in violation of 18 U.S.C. § 1001 was supported by claims that Petitioner lied to agents from the SSA's Office of Inspector General. *Id*. at 5.

      **B.**    **THE TRIAL**

The case proceeded to a jury trial in September 2005. Testimony at trial established that illegal aliens would pay Rojas a fee and, in exchange, Rojas would collect their information and pass it along to Petitioner, who would approve the fraudulent social security card applications. Govt.'s Answer to Pet'r's Pet. for Writ of Error Coram Nobis ("Answer") (Dkt. 212) at 5-6.

With respect to the honest services mail fraud charges, the Government offered that Petitioner was required to discharge her duties to the SSA honestly and faithfully, without a conflict of interest. Pet'r's Reply to Govt.'s Answer ("Reply") (Dkt. 217) at 2-3. SSA regulations prohibited employees from performing services for friends, relatives, or acquaintances because by performing such a service, there was a substantial risk of a conflict of interest. *Id.* Thus, the prosecution presented

evidence that, by performing services for Rojas, Petitioner violated SSA rules protecting against conflicts of interest; Petitioner thereby defrauded the SSA of her honest services, in violation of 18 U.S.C. §§ 1341 & 1346.

In order to establish a motive for Petitioner's actions, the Government sought to introduce evidence showing that Petitioner benefitted financially from the scheme. *Id.* at 7. The government introduced evidence that, during the relevant period, cash deposits totaling approximately $7,000 had been made into Petitioner's bank account. *Id.* The Government also elicited testimony that Petitioner received furniture (a "floor model") from the store Rojas managed at a substantial discount. *Id.*

This profit-motive theory was hotly contested. Petitioner introduced testimony at trial that she received regular rent payments from her sister in cash, and she also submitted a sworn declaration at sentencing stating that her husband would often cash checks with the issuing bank and then deposit that cash into their joint account. Pet. at 7. She also introduced evidence that she made a good living from her SSA wages and from a second job teaching English as a second language. *Id.* She challenged the testimony about receiving a good deal on furniture by having the testifying witness admit that it was not unusual to discount worn floor models; Petitioner also sought to highlight inconsistencies in that witness' testimony. *Id.*

Petitioner did not testify at trial, nor did her co-defendant Rojas, who pled guilty and signed a cooperation agreement with the Government. *Id.* None of the illegal alien applicants who paid Rojas testified that they knew who Petitioner was or that they paid her. *Id.*

### C. THE JURY INSTRUCTIONS

The jury was instructed that in order to convict Petitioner of honest services mail fraud, they must find each of the following four elements beyond a reasonable doubt:

> First, defendant knowingly devised or participated in a scheme or plan to deprive the [SSA] of its right to honest services.
>
> Second, the scheme involved the use of materially false statements or pretenses or the concealment of material facts.
>
> Third, the defendant acted with an intent to defraud, that is, an intent to deceive or cheat.
>
> And fourth, the defendant used or caused someone to use the mails to carry out or attempt to carry out the scheme or plan.

Pet. Ex. B; RT 9/15/05: Vol. II (Dkt. 168) at 110. These instructions were given without objection.

The Government also proposed a jury instruction that provided a brief definition of the term "honest services" which explained that a public agency has an intangible right to its employees' honest services, *e.g.*, a right not to have its employees make decisions acting under a conflict of interest. Reply at 3; *see also* RT 9/13/05: Vol. III (Dkt. 154) at 102 (Prosecution to the Court: "I think it's helpful and instructive for the jury to hear from the Court what 'honest services' mean in general."). The defense objected to this proposed instruction, stating that it was argumentative, suggested a lower burden for the prosecution, and was unsupported by the citations offered by the government. RT 9/13/05: Vol. III at 102. Over that objection, the following instruction regarding a "conflict-of-interest" theory of honest services fraud was given:

> The right to honest services includes the right of a public agency to have their employees conduct their assigned duties and make related government decisions in the best interest of the public consistent with law and *conducted without regard to conflicting interests of the employee or other persons*.

Pet. Ex. B; RT 9/15/05: Vol. II at 111 (emphasis added).

Petitioner also objected to the Government's proposed instruction that stated: "The Government is also not required to prove that the defendant personally secured any financial or monetary gain." RT 9/13/05: Vol. III at 105. Petitioner objected to this instruction on the grounds that it was argumentative and was proposed simply to refute a defense argument that there was no evidence of financial gain. *Id.* at 105-07. The Government defended its proposed instruction, stating:

> We don't have to prove monetary gain. . . . It makes certain that the jury is not misled as to what we do have to prove. . . . It's important – especially on this point, in light of the Defendant's intended argument, which is she didn't get any money – for the jury to know: we don't have to prove that. . . . It's important for them to know that rule.

*Id.* at 107. The Court agreed with the Government, stating:

> It appears to me that you don't have to have a financial or monetary gain [to convict for honest services mail fraud]. You can commit the same crime simply out of friendship. . . . I don't know why the Government [is] negated from arguing also that this was simply done out of friendship.

*Id*. at 106. Over Petitioner's objection, the proposed instruction was given to the jury. Pet. Ex. B; RT 9/15/05: Vol. II at 111. This instruction explicitly told the jury that they could still convict Petitioner if they did not believe she had benefitted financially from the scheme; it thus relieved the Government entirely from having to prove that Petitioner received anything as part of the fraud.

The jury returned a general verdict convicting Petitioner on all eleven counts of honest

services mail fraud and the single count of lying to a federal agency. Pet. at 9. The verdict form did not indicate that the jury found that Petitioner benefitted financially from the fraud, as the instructions had told them such a finding was unnecessary. *Id.*

### D. SENTENCING

The sentencing hearing took place over two days in 2006. The Court made clear that it was making its findings for possible sentencing enhancements by a preponderance of the evidence standard. *See* RT 5/22/06: Vol. I (Dkt. 160) at 8-9, 11-13 (discussing with counsel what evidentiary standard to apply in finding a sentencing enhancement in the wake of *United States v. Booker*, 543 U.S. 220 (2005)); RT 8/14/06: Vol. I (Dkt. 172) at 17-18.

For sentencing purposes, Petitioner – who had no criminal history – submitted a sworn declaration essentially confessing to the crimes she had been convicted of in order to receive a lighter sentence. *See* Pet. Ex. C. In her declaration, she specifically stated that she did not financially benefit from the scheme. *Id.* ¶ 7. Instead, she described how she initially became involved out of sympathy for the plight of undocumented immigrants (Petitioner herself is an immigrant and naturalized citizen), a sympathy to which Rojas pandered. *Id.* ¶ 4-5. She declared that Rojas coerced her into continuing her involvement by intimidation. *Id.* ¶ 5. Based on the declaration, Petitioner sought a two-level reduction to the offense level for an acceptance of responsibility under U.S.S.G. § 3E1.1 and a three-level reduction for a lack of profit motive under U.S.S.G. § 2L2.1(b)(1). *See* RT 8/14/06: Vol. II (Dkt. 181) at 18-20, 26-28. Petitioner's counsel argued that the declaration should be given great weight because, by essentially confessing to the crimes, Petitioner had effectively forfeited substantial legal rights both on appeal and should the case ever be remanded for retrial. RT 5/22/06: Vol. II (Dkt. 169) at 7-8. The Court appreciated this argument and took it into consideration. *Id.* at 8.

The Court granted Petitioner a two-level reduction based on its discretion under 18 U.S.C. § 3553, taking into consideration her belated acceptance of responsibility as well as "the holistic viewpoint of her as a person." RT 8/14/06: Vol. II at 49-50. The Court was "extremely impressed by [Petitioner's] life" and justified the departure because it found by a preponderance of the evidence that the scheme began as Petitioner described – through friendship and empathy. *Id.* at 40-41; *see also id.* at 50 ("I found that this was appropriate because of her employment and vocational and educational skills and her mental health condition, and I'd combined all of those factors. I also made the side statement that I was impressed with – with her outside activities concerning The Braille Institute and her efforts concerning English as a second language.").

The Court did not grant the requested reduction for a lack of profit motive. RT 8/14/06: Vol. II at 39. The Court agreed that Petitioner's empathy theory was "quite possible and supported" by argument and Petitioner's declaration, but chose not to "subscribe that there was no profit motive." *Id.* at 38. The Court found that the evidence relating to the discount Petitioner allegedly received on furniture was enough to find, by a preponderance of the evidence, that Petitioner had profited from the

scheme. *Id.* ("[T]here were benefits obtained, or at least the offer of benefits . . . though it's something as silly as a de minimis amount[.]"); *see also id.* at 41 ("[I]f you didn't get the actual benefit, you got the offer of some – just some little goodies along the way that didn't mean much, in retrospect. They're what we call rewards."). In comparison, the Court recognized that the evidence showing receipt of cash payments was weak. *See id.* at 38-39. The Court "frankly" observed that it could not make a determination if the cash deposits into Petitioner's account were the result of kickbacks from Rojas; the Court found that there was "no proof that she actually received [those kickbacks]." *Id.* But with respect to the furniture, the Court was clear as to why it was not awarding the downward adjustment for lack of profit motive: "I think there is some reward that she obtained. I don't want that to be misconstrued, and I did find that there is some profit that she made[.]"[2] *Id.* at 46.

Petitioner was sentenced to fifteen months imprisonment, three years probation, and ordered to pay a $1,200 special assessment and $2,000 in restitution. *See* Judgment & Commitment Order (Dkt. 140).

### E.     APPEAL

Petitioner directly appealed her conviction to the Ninth Circuit. One of the grounds for her appeal was that the jury instructions given regarding honest services "fatally diluted the meaning of 'honest services' and erroneously told the jury that the government was not required to prove that Ms. Colino profited from the offense." *See* Appellant's Opening Brief, 2007 WL 2063618. Petitioner adamantly argued that, under Ninth Circuit precedent, a conviction under an intangible right to honest services theory required proof of financial gain by the accused. *See id.* She also appealed the Court's finding of a profit motive at sentencing and the restitution order. *See id.*

The Ninth Circuit rejected most of Petitioner's arguments in an unpublished decision, *United States v. Colino*, No. 06-50486, 2007 WL 2316327 (9th Cir. Aug. 14, 2007). The court found that the jury instructions did not lower the government's burden of proof because they complied with the language of the statutes, citing to two cases not dealing with honest services fraud. *Colino*, 2007 WL 2316327, at *1. The Ninth Circuit then found that this Court did not abuse its discretion in denying a sentencing reduction for a lack of profit motive, stating that the burden to prove that Petitioner was entitled to a downward adjustment rested with her, and that she failed to do so. *Id.* at *2. However, the Ninth Circuit did find that this Court abused its discretion in awarding restitution. *Id.* On remand, the Ninth Circuit instructed this Court to "limit its findings to any ill-gotten gains Colino herself accrued." *Id.* On remand, the restitution order was stricken. Re-Sentencing Hearing, Dkt. 195.

---

[2]Petitioner objected to this finding, but the Court informed Petitioner's counsel that even had it granted the downward adjustment for a lack of profit motive, Petitioner's sentence would only have been one month shorter because the Court would have then sentenced Petitioner to the maximum under those revised calculations. RT 8/14/06: Vol. II at 46-48.

        **F.**       **THE CURRENT PETITION**

Petitioner paid the special assessment and served her entire sentence, including probation, without incident. Pet. at 2. She now brings this Petition for a writ of coram nobis seeking to vacate the eleven counts of conviction for honest services mail fraud. *Id*. She brings this Petition because of the recent change in law announced by the Supreme Court in *Skilling v. United States*, 130 S. Ct. 2896 (2010), which, she argues, makes her prior conduct non-criminal, and because those eleven counts of conviction will make it substantially harder for her to regain her California teaching credential. Pet. at 4-5.

        **II.**     *SKILLING* **AND A BRIEF SUMMARY OF HONEST SERVICES FRAUD**

On June 24, 2010, the Supreme Court of the United States handed down its decision in *Skilling v. United States*, radically changing the definition of "honest services" as defined in 18 U.S.C. § 1346. 130 S. Ct. 2896, 2933 (2010). In reaching its decision, the Supreme Court provided a history of the development of "honest services" fraud that proves illustrative in the present case.

The mail fraud statute, 18 U.S.C. § 1341, prohibits the use of the mails to advance "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." Emphasizing the disjunctive phrasing, in the 1940s, Courts of Appeals began to interpret the phrase "scheme or artifice to defraud" to include the deprivation of "intangible rights," as well as money or property. *Skilling*, 130 S. Ct. at 2926; *see also Shushan v. United States*, 117 F.2d 110 (5th Cir. 1941) (giving birth to the honest services fraud doctrine). This "intangible rights" doctrine encompassing "honest services" was a variant of traditional fraud, where one person directly benefits from another's loss. *Skilling*, 130 S. Ct. at 2926. Unlike traditional fraud, honest services fraud lacks that kind of symmetry. *Id.* Under the intangible rights doctrine, public officials were convicted of honest services fraud for actions such as a mayor's receipt of a bribe and subsequent award of a city contract to the bribe-giver, even though the contract awarded was no better or worse than one the city could otherwise have negotiated. *Id.* Even if the fraud resulted in a property *gain* for the defrauded party (*e.g.*, the city), the offending official could still be convicted of honest services fraud. *Id.* The rationale for conviction was that the "actionable harm lay in the denial of [the deceived] party's right to the offender's 'honest services.'" *Id.*

In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court "stopped the development of the intangible-rights doctrine in its tracks." *Skilling*, 130 S. Ct. at 2927. In *McNally*, prosecutors charged that a Kentucky state official deprived the citizens and government of Kentucky of their intangible right to honest services when, in selecting the state's insurance agent, he arranged to receive kickbacks from that agent. 483 U.S. at 360. Notably, prosecutors did not allege that the scheme had resulted in financial harm to Kentucky; rather, the prosecution relied entirely on the "intangible rights" doctrine. *Id.* at 353. The Supreme Court invalidated the intangible rights theory of liability, limiting the mail fraud statute's scope to protecting only property rights. *Id.* at 360. The Court

stated, "If Congress desires to go further, it must speak more clearly than it has." *Id.*

Congress' response was swift. The following year it enacted 18 U.S.C. § 1346, which defined "scheme or artifice to defraud" in the mail and wire fraud statutes as including "a scheme or artifice to deprive another of the intangible right of honest services." *Skilling*, 130 S. Ct. at 2927; *see also* 18 U.S.C. § 1346. Thus, Congress acted to explicitly safeguard one of the intangible rights that had been protected pre-*McNally*: the intangible right to "honest services." *Skilling*, 130 S. Ct. at 2927. Congress, however, left open the question of the outer boundaries of that intangible right.

Jeffrey Skilling was formerly the CEO of Enron, which had previously been one of the largest companies in America before its sudden, spectacular demise in 2001. *Id.* at 2907. In 2004, Skilling was indicted for, among other things, conspiracy to commit honest services wire fraud. *Id.* at 2908. The indictment alleged that he sought to "depriv[e] Enron and its shareholders of the intangible right of [his] honest services" by misrepresenting the company's fiscal health. *Id.* (alterations in original). Skilling was ultimately convicted on nineteen counts, including the honest services wire fraud charge. *Id.* at 2911.

Skilling appealed his conviction to the Supreme Court, arguing that "the intangible right of honest services" language in 18 U.S.C. § 1346 was unconstitutionally vague. *Id.* at 2927-28. The Supreme Court rejected this argument and instead sought to construe the statute. *Id.* at 2928. The Court concluded that in enacting 18 U.S.C. § 1346, Congress intended to prohibit schemes such as those in *McNally*, whereby one party deprives another of honest services at the behest of an undeceived third-party who bribes or offers kickbacks to the offender. *Id.* at 2931. The Supreme Court explicitly rejected a "conflict-of-interest" theory of liability, holding that 18 U.S.C. § 1346 criminalized *only* schemes where the defendant solicited or accepted bribes/kickbacks. *Id.* at 2932 ("In light of the relative infrequency of conflict-of-interest prosecutions in comparison to bribery and kickback charges, and the intercircuit inconsistencies they produced, we conclude that a reasonable limiting construction of § 1346 must exclude this amorphous category of cases."). Thus, the *Skilling* decision significantly restricted the types of conduct considered criminal under 18 U.S.C. § 1346 by requiring bribes or kickbacks to trigger honest services fraud liability. *Id.*

### III.   PROCEDURAL DEFAULT

Before beginning the discussion of coram nobis and whether Petitioner is entitled to the writ, the Court must first address whether, as the Government suggests, Petitioner has "procedurally defaulted" her claim. Answer at 15.

Procedural default rules hold that when a conviction is collaterally attacked – such as in a habeas corpus or coram nobis petition – the grounds on which the conviction is collaterally attacked must have been raised by the petitioner in a pervious proceeding, usually by objecting at trial and/or raising the issue on direct appeal. *See United States v. Frady*, 456 U.S. 152, 166-68 (1982) (holding

that the societal interest in final judgments supports the procedural default rule). In the absence of a timely objection at trial, a petitioner collaterally attacking a conviction on grounds that were not previously raised must do one of two things. A petitioner may excuse procedural default by showing "cause" for the default and "actual prejudice" resulting from the claimed error. *Id.* at 167-68. Alternatively, a petitioner can attempt to show that he or she was "actually innocent" of the offense. *Bousley v. United States*, 523 U.S. 614, 622 (1998).

In the wake of *Skilling*, federal courts have issued a number of decisions addressing procedural default rules in the context of determining what objections at trial properly preserve a claim from default on collateral review. Issued the same day as the *Skilling* decision, *Black v. United States*, 130 S. Ct. 2963 (2010), proves particularly helpful.

In *Black*, the Supreme Court discussed whether the objections made by the defendant at trial were sufficient to preserve his claim of instructional error on appeal. 130 S. Ct. at 2968. At trial, the defendant had objected to a jury instruction on honest services fraud that allowed the jury to convict him if it found that he had "knowingly and intentionally breache[d] his duty of loyalty." *Id.* at 2967. The Supreme Court held that this objection was sufficient to preserve the defendant's claim on appeal, even though he had rejected special verdict forms that would have indicated whether the jury was convicting under a conflict-of-interest or money-or-property theory of honest services fraud. *Id.* at 2970. Because 18 U.S.C. § 1346 under *Skilling* criminalizes only schemes that involve bribes and kickbacks (*e.g.*, the money-or-property theory), the defendant properly objected to the clearly erroneous jury instruction that permitted the jury to convict under a conflict-of-interest theory. *Id.* at 2968, 2970.

In the present case, the Government argues that Petitioner has procedurally defaulted the claim upon which her petition rests because at no point in the previous proceedings did Petitioner raise the argument that 18 U.S.C. § 1346 was unconstitutionally vague.[3] Answer at 15. The Court rejects this argument because the Government incorrectly assumes that the grounds for the current petition are that 18 U.S.C. § 1346 is unconstitutionally vague.

The current petition contends that the jury instructions at Petitioner's trial allowed her to be convicted for conduct not criminalized by 18 U.S.C. § 1346. *See* Pet. at 2 ("Ms. Colino argues that

---

[3]It should also be noted that the Supreme Court in *Skilling* explicitly rejected the argument that 18 U.S.C. § 1346 was unconstitutional, choosing instead to construe the statute. *Skilling*, 130 S. Ct. at 2928. This Court is uncertain as to what the Government is attempting to prove by arguing that Petitioner should have previously raised an objection that the Supreme Court rejected. *Cf. Ryan v. United States*, 645 F.3d 913, 915 (7th Cir. 2011) (holding in part that the petitioner in that case had defaulted his claim of erroneous jury instructions on appeal because the grounds for his original objection at trial were that 18 U.S.C. § 1346 was unconstitutionally vague, an argument rejected by the Supreme Court).

her convictions were unlawful and that the error was fundamental because the conduct of which she was convicted does not constitute honest services fraud [as defined in *Skilling*]."); Reply at 7 ("Ms. Colino argues now – as she did on direct appeal – that the jury instructions in her case allowed the jury to convict her based on conduct that § 1346 does not criminalize."). She raised this objection at trial, *see* RT 9/13/05: Vol. III at 102, 105-07, as well as on direct appeal. *See Colino*, 2007 WL 2316327, at *1 (rejecting Petitioner's argument that the jury instructions fatally diluted the definition of 'honest services'). The Government's attempt to recharacterize Petitioner's current objection as resting on constitutional vagueness grounds, and then claim procedural default by comparing it to Petitioner's previous objections, is disingenuous. Petitioner previously objected that the jury instructions, which defined a conflict-of-interest theory of honest services fraud and obviated a finding of financial gain, were flawed. She currently raises the exact same objection. The present situation is indistinguishable from *Black* with respect to the objections raised. There, the Supreme Court held that an objection at trial to jury instructions that allowed for an honest services conviction under a conflict-of-interest theory was sufficient to preserve a claim exactly like Petitioner's on appeal. *Black*, 130 S. Ct. at 2970. Thus, because Petitioner properly objected to the jury instructions at trial and on direct appeal, and because she now brings the same claim in her collateral attack, Petitioner has not defaulted her claim that the jury instructions here allowed her to be convicted for conduct that 18 U.S.C. § 1346 does not criminalize. No procedural default has occurred, and her collateral attack may continue.[4] The Court thus proceeds to the merits of her petition.

### IV. WRIT OF CORAM NOBIS

#### A. LEGAL STANDARD

A writ of coram nobis is an "extraordinary" remedy available only in unusual circumstances. *United States v. Riedl*, 496 F.3d 1003, 1005 (9th Cir. 2007). The writ "affords a remedy to attack a conviction when the petitioner has served his sentence and is no longer in custody." *Estate of McKinney v. United States*, 71 F.3d 779, 781 (9th Cir. 1995). "Specifically, the writ provides a remedy for those suffering from the lingering collateral consequences of an unconstitutional or unlawful conviction based on errors of fact and egregious legal errors." *Id.* (citations and quotation marks omitted). If Petitioner can show she is entitled to the writ, the writ permits this Court to vacate

---

[4]Furthermore, the Court notes that it is persuaded by the reasoning espoused in *Stayton v. United States*, 766 F. Supp. 2d 1260, 1265 (M.D. Ala. 2011), which held that even in cases of procedural default, the *Skilling* decision provides the "cause" excusing that default under *Frady* because *Skilling* was such a clear break with prior law. Though the Government here does not concede the "actual harm" prong of the *Frady* analysis as it did in *Stayton*, as will be discussed below in Section IV.D, *infra*, the Court finds that Petitioner has demonstrated "actual harm" as a result of her convictions. Thus, even if Petitioner had defaulted her claim, she has shown both cause and prejudice sufficient to overcome that default. *See Frady*, 456 U.S. at 167-68; *Stayton*, 766 F. Supp. 2d at 1269.

its judgment and overturn her convictions after her sentence has been served. *Hirabayashi v. United States*, 828 F.2d 591, 604 (9th Cir. 1987). Courts have authority to issue a writ of coram nobis pursuant to the All Writs Act, 28 U.S.C. § 1651(a). *McKinney*, 71 F.3d at 781.

In order to qualify for a writ of coram nobis, a petitioner must satisfy four requirements, showing that: (1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy Article III standing; and (4) the error is fundamental. *See Riedl*, 496 F.3d at 1006 (listing the requirements and noting that "[w]e have repeatedly reaffirmed this framework in the ensuing two decades" since its adoption in *Hirabayashi*); *Hirabayashi*, 828 F.2d at 604.

### B.   A MORE USUAL REMEDY IS NOT AVAILABLE

The Government concedes that because Petitioner has already served her entire sentence, a more usual remedy such as habeas relief is not available. Answer at 27.

### C.   VALID REASONS EXIST FOR NOT ATTACKING THE CONVICTION EARLIER

The second inquiry under a petition for a writ of coram nobis requires Petitioner to present valid reasons for not attacking her conviction earlier. *Riedl*, 496 F.3d at 1006. To meet this requirement, the petitioner must show "sound reasons" for the delay. *See Maghe v. United States*, 710 F.2d 503, 503 (9th Cir. 1983) (denying a writ of coram nobis where the petitioner provided no reasons justifying a twenty-five year delay in seeking relief from a prior conviction). The Ninth Circuit has held that when a law changes retroactively, valid reasons exist for not attacking a conviction earlier. *See United States v. Walgren*, 885 F.2d 1417, 1421 (9th Cir. 1989); *Martinez v. United States*, 90 F. Supp. 2d 1072, 1076 (D. Haw. 2000) ("The Ninth Circuit has determined that a recent and fully retroactive change in the law constitutes a valid reason for delay.").

The decision in *Walgren* proves especially illustrative. As discussed above, the Supreme Court in 1987 halted the development of the intangible rights theory of mail and wire fraud, holding that the mail and wire fraud statutes criminalized only deprivations of tangible property. *McNally*, 483 U.S. at 360. The petitioner in *Walgren* had been convicted under an intangible rights theory of mail fraud, so after *McNally*, he collaterally attacked his prior conviction. *Walgren*, 885 F.2d at 1420. The Ninth Circuit reversed the district court's denial of a writ of coram nobis, holding in part that a recent, fully retroactive change in the law constitutes a valid reason for not attacking a conviction earlier. *Id.* at 1421.

Because *Skilling* recently and retroactively changed the law governing honest services fraud, Petitioner has a valid reason for not attacking her conviction earlier. *Skilling*, like *McNally* before it, radically changed the law with respect to honest services mail/wire fraud. And *Skilling*, like

*McNally* before it, is fully retroactive. *See Black*, 130 S. Ct. at 2970 (vacating honest services fraud convictions and remanding the matter for consideration in light of the new honest services fraud standard espoused in *Skilling*); *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004) (holding that "decisions that narrow the scope of a criminal statute by interpreting its terms" apply retroactively); *Bousley*, 523 U.S. at 620 (holding that Supreme Court decisions which narrow the scope of substantial federal criminal statutes apply retroactively on collateral review); *Ryan*, 645 F.3d at 915 (noting that Supreme Court precedent strongly implies that *Skilling* applies retroactively); *Martignoni v. United States*, Nos. 92 Cr. 1097(JFK), et al., 2011 WL 4834217, at *9 (S.D.N.Y. Oct. 12, 2011) (granting coram nobis relief after *Skilling* where the government conceded the retroactivity of *Skilling*); *Rodrigues v. United States*, Nos. 10-00406 DAE-KSC, et al., 2011 WL 529158, at *8 (D. Haw. Jan. 31, 2011) ("*Skilling* must apply retroactively to criminal convictions under 18 U.S.C. § 1346."). The *Skilling* decision substantially narrowed the scope of a criminal statute by interpreting its terms. *See Skilling*, 130 S. Ct. at 2931. Therefore, it cannot be argued that *Skilling* does not apply retroactively, and this Court is presented with an identical situation to that in *Walgren*. Thus, because of the recent retroactive change in the law, valid reasons exist for not attacking Petitioner's conviction sooner. *Walgren*, 885 F.2d at 1421. Petitioner satisfies the second coram nobis requirement.

The Government's arguments to the contrary fail. First, the Government essentially repeats its earlier procedural default argument, stating that a claim not raised on direct appeal is outside the scope of collateral review. Answer at 28. This argument fails because, as noted above, Petitioner is currently raising the same argument that she raised on direct appeal, and because the Government cites no authority likening procedural default to invalid reasons for delay. Second, the Government claims that the change in law announced by *Skilling* does not provide the requisite excuse for her delay. Answer at 28. As discussed above, this argument is flatly contradicted by *Walgren*. *See Walgren*, 885 F.2d at 1421. Finally, the Government contends that Petitioner's delay has prejudiced the Government because now it may no longer bring time-barred charges against Petitioner under different statutes. Answer at 29. The government fails to direct this Court to any authority supporting the proposition that prejudice to the Government is a valid reason for finding that Petitioner delayed too long in bringing her claim. On that basis alone, the argument fails. It should also be noted, however, that the Government's cited example of a time-barred statute – 42 U.S.C. § 408(a)(7)(c) – was already alleged by the Government, yet the grand jury failed to return an indictment on this count.[5] *See* Criminal Complaint, Dkt. 1. The Government had ample time to charge Petitioner with whatever crimes it thought appropriate and it did so, twice receiving indictments. Even if prejudice to the government should be considered, no prejudice has resulted from the delay. Because *Skilling* changed the scope of 18 U.S.C. § 1346 so dramatically, valid reasons exist for Petitioner's having not challenged her conviction earlier. *See Walgren*, 885 F.2d at 1421.

---

[5]Interestingly, this criminal statute requires the Government to prove receipt of payment by the accused, yet the Government was unable to indict on this charge. *See* 42 U.S.C. § 408(a)(7)(c); Criminal Complaint, Dkt. 1.

### D. PETITIONER CONTINUES TO SUFFER THE ADVERSE CONSEQUENCES OF HER CONVICTION

The third inquiry under a petition for a writ of coram nobis requires Petitioner to show that she continues to suffer from the adverse consequences of her conviction in order to assert standing under Article III. *See* U.S. Const. art. III, § 2, cl. 1 (requiring a "case" or "controversy" in order to assert federal jurisdiction); *Riedl*, 496 F.3d at 1006. The Ninth Circuit has held that an "irrefutable presumption" exists, which presumes "that collateral consequences result from any criminal conviction." *Chaker v. Crogan*, 428 F.3d 1215, 1219 (9th Cir. 2005); *see also Chacon v. Wood*, 36 F.3d 1459, 1463 (9th Cir 1994) (superseded by statute on other grounds) (holding that the presumption that collateral consequence flow from a criminal conviction "is an irrebuttable one"); *Wood v. Hall*, 130 F.3d 373, 376 (9th Cir. 1997) ("There is an 'irrebuttable' presumption that collateral consequences arise from any criminal conviction."). The Ninth Circuit has held that these collateral consequences irrefutably flow even when vacating a previous conviction leaves other convictions arising from the same conduct intact. *See Walgren*, 885 F.2d at 1421-22 (describing the presumption that collateral consequences flow from a past conviction as "liberal"). Thus, the law in the Ninth Circuit establishing an irrefutable presumption that collateral consequences inevitably flow from a prior conviction is well-established.[6]

Once again, *Walgren* proves instructive. There, the government argued that the petitioner could not show he suffered adverse consequences resulting from his prior honest services fraud conviction because, even were the court to grant him coram nobis relief, a conviction arising from the same underlying conduct would remain untouched. *Walgren*, 885 F.2d at 1421. Because of the discretionary nature of the sentencing guidelines and possible impeachment at a later trial, the Ninth Circuit flatly rejected that argument. *Id.* at 1422 ("More than a possibility exists that the existence of an additional felony conviction will militate against a sentence at the lower end of the guideline

---

[6] The Ninth Circuit has gone so far as to recognize that adverse collateral consequences flow from a prior conviction even when the petitioner is serving a life sentence for a separate conviction. *See Alaimalo v. United States*, 645 F.3d 1042, 1050 (9th Cir. 2011) (citing *Ball v. United States*, 470 U.S. 856, 865 (1985) ("The separate *conviction*, apart from the concurrent sentence, has potential adverse collateral consequences that may not be ignored." (emphasis in original)); *Spencer v. Kemna*, 523 U.S. 1, 12 (1998) ("In the context of criminal conviction, the presumption of significant collateral consequences is likely to comport with reality."); *United States v. Kincaid*, 898 F.2d 110, 112 (9th Cir. 1990) ("Although neither we nor [Petitioner] can identify a specific prejudice which may stem from his erroneous sentence, we are unwilling to place upon [Petitioner] the risk that such a prejudice will manifest itself in the future."); *Holloway v. United States*, 393 F.2d 731, 732 (9th Cir. 1968) ("Coram nobis must be kept available as a post-conviction remedy to prevent 'manifest injustice' even where the removal of a prior conviction will have little present effect on the petitioner.")).

range.").

Petitioner admits that granting her a writ of coram nobis will leave her prior conviction for lying to federal agents intact. Pet. at 15-16. This fact has no effect, however, because the Ninth Circuit has established an irrebuttable presumption that collateral consequences naturally flow from a prior conviction, even if vacating a conviction leaves other convictions arising from the same conduct intact. *See Chaker*, 428 F.3d at 1219; *Walgren*, 885 F.2d at 1421-22. Petitioner has thus established adverse consequences resulting from her prior convictions sufficient to assert standing under Article III.

Further, even were the presumption rebuttable, Petitioner has shown that she suffers actual consequences as a result of her prior convictions. Petitioner would like to be re-credentialed as a teacher in California. Pet. at 2-3. The honest services fraud convictions make this re-credentialing more difficult, notwithstanding the fact that Petitioner's conviction for lying to federal agents would remain unchanged were this Court to grant her coram nobis relief. *See* Cal. Educ. Code §§ 44345(e) & 44424 (stating that the re-credentialing commission may deny a teaching credential for acts involving "moral turpitude" and convictions for embezzlement and theft); 5 CCR §§ 80302(4)-(5) (directing the re-credentialing commission in its investigation of alleged misconduct to consider any extenuating circumstances and the alleged offender's motives). In support of her claim that her prior convictions of honest services fraud hinder her ability to be re-credentialed, Petitioner has submitted an order from an administrative law judge delaying her re-credentialing hearing until the outcome of this matter is decided. *See* Notice Re Status of Administrative Hearing Before California Commission on Teacher Credentialing (Dkt. 218) (letter from Administrative Law Judge Susan Formaker stating: "If [Ms. Colino's] convictions [for honest services mail fraud] . . . are overturned, the outcome of this administrative hearing could be affected substantially."). The Court is hard-pressed to think of a better way to demonstrate adverse consequences than a letter from the administrative law judge overseeing Petitioner's re-credentialing hearing staying that hearing because whether or not Petitioner's convictions are vacated may "substantially" affect the outcome. Thus, Petitioner has amply demonstrated actual consequences resulting from her honest services fraud convictions.

The Government argues that Petitioner has not shown actual harm resulting from her honest services fraud convictions because the re-credentialing commission may choose not to grant Petitioner a new credential with or without those convictions on her record. Answer at 30. The Government argues that because California Education Code Section 44345(e) allows the commission to deny her application for acts of "moral turpitude," vacating Petitioner's prior convictions will have no effect because, unless Petitioner plans on "whitewashing" her application, she will still have to explain to the commission her actions with respect to falsifying social security card applications. *Id.* at 30. While the Government is correct on this point, it ignores the discretion afforded the commission in making its credentialing determinations, which allows the commission to take into account any extenuating circumstances and the applicant's motives. *See* 5 CCR §§ 80302(4)-(5). Honest services fraud convictions, as articulated in *Skilling*, require that the offender solicited or accepted bribes or kickbacks; thus, leaving these convictions in place would imply substantially different motives than the

altruistic ones Petitioner asserts as the reason for her participation in the scheme. Therefore, the Government's argument that leaving the honest services fraud convictions untouched will have no effect on Petitioner's re-credentialing effort is without merit.

As a final matter, the Government, "to preserve the issue if need be," asks this Court to rule that the Ninth Circuit's presumption that collateral consequences inevitably flow from a criminal conviction is "legally invalid." Answer at 33. This Court declines to overrule the Ninth Circuit. The Government is free to take up this argument on appeal with the Ninth Circuit directly. Petitioner has more than sufficiently demonstrated the adverse consequences flowing from her honest services mail fraud convictions.

### E. THE ERROR WAS FUNDAMENTAL

The fourth and final inquiry under a petition for a writ of coram nobis requires Petitioner to show that the error she complains of was "of the most fundamental character." *Riedl*, 496 F.3d at 1006. In *United States v. Rodrigues*, the Ninth Circuit recently discussed, in a case involving a collateral attack also based on the recent *Skilling* decision, what standard of review to apply when searching for a fundamental error. — F.3d —, —, 2012 WL 1001349, at *1 (9th Cir. Mar. 27, 2012). The Ninth Circuit applied the test from *Brecht v. Abrahamson*, which requires finding beyond a reasonable doubt that the complained-of error had no "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. 619, 623 (1993); *see also Hedgpeth v. Pulido,* 555 U.S. 57, 61-62 (2008) (whether a defendant suffered prejudice from an instructional error is governed by the *Brecht* standard); *Neder v. United States*, 527 U.S. 1, 15 (1999) (harmlessness with respect to the omission of an element of the offense from the instructions must be demonstrated beyond a reasonable doubt). Thus, under *Brecht* and per *Rodrigues*, this Court's task is to inquire whether it is clear beyond a reasonable doubt that a rational jury would have found Petitioner guilty of honest services mail fraud (as limited to bribes and kickbacks under *Skilling*) absent the complained-of error. *Rodrigues*, — F.3d at —, *3 (citing *Neder*, 527 U.S. at 18).

The *Rodrigues* decision is illuminating. There, as here, the petitioner challenged his honest services fraud convictions in the wake of *Skilling*. *Rodrigues*, — F.3d at —, *1. The underlying indictment charged the petitioner with engaging in a "classic" kickback scheme whereby he arranged for "consulting fees" to be paid to his relatives by medical insurers insuring state employees. *Id.* at —, *2. The evidence that the petitioner had received these kickbacks was "overwhelming." *Id.* at —, *5. However, because the jury instructions did not instruct that the jury must find beyond a reasonable doubt that the petitioner's scheme involved kickbacks, the petitioner claimed a constitutional error in the wake of *Skilling*. *Id.* at —, *1. The Ninth Circuit found that the omission of the kickback element from jury instructions was "harmless" because the indictment clearly alleged a kickback scheme, the evidence of kickbacks at trial was "overwhelming," and because the petitioner was also found guilty on a separate count of embezzlement. *Id.* at —, *7-*8.

Even had the jury been properly instructed, this Court holds that the evidence of financial gain by Petitioner was insufficient to support a conviction beyond a reasonable doubt for honest services mail fraud. The evidence of financial gain presented by the Government in this case was far from "overwhelming," as it was in *Rodrigues*. *See Rodrigues*, — F.3d at —, *5; *see also United States v. Wilkes*, 662 F.3d 524, 544 (9th Cir. 2011) (upholding an honest services fraud conviction on direct appeal following the *Skilling* decision because the jury also found the defendant guilty under a separate federal bribery statute, and therefore the omission of the bribery/kickback element from the jury instructions was harmless). First, unlike *Rodrigues*, the indictment in this case does not allege a "classic" kickback scheme. Instead, it very clearly delineates the roles of Petitioner and Rojas with one exception – who charged the illegal aliens the cash fee. The indictment simply makes the unadorned statement: "The card applicants generally were charged approximately $1,300 to $3,000 for each Social Security Card." *See* Pet. Ex. A., First Superceding Indictment. Thus, per what was alleged in the indictment, it was possible for Petitioner to have committed honest services fraud "out of friendship," as the Court noted. RT 9/13/05: Vol. III at 106. Other courts have granted writs of coram nobis where the indictment does not allege a valid bribe/kickback theory of honest services fraud. *See Lynch v. United States*, 807 F. Supp. 2d 224, 234-35 (E.D. Pa. 2011) (granting coram nobis relief where the petitioner had pled guilty to an indictment that did not properly allege a bribe or kickback theory of honest services fraud); *United States v. Sutton*, No. 5:08-cr-40 (HL), 2011 WL 7394519, at *2 (M.D. Ga. Nov. 10, 2011) (finding that a guilty plea to an indictment that only alleged a conflict-of-interest theory of honest services fraud warranted a grant of coram nobis relief). The conduct alleged in Petitioner's indictment does not support a criminal conviction for honest services fraud post-*Skilling* because it did not allege a valid theory of the crime. *Cf. Lynch*, 807 F. Supp. 2d at 227-28 (granting coram nobis relief even though the indictment in that case alleged bribes/kickbacks much more clearly than here).

Second, and more importantly, the facts here do not support a finding beyond a reasonable doubt that Petitioner solicited or received bribes or kickbacks as a result of her participation in the scheme. As opposed to the voluminous evidence of kickbacks and embezzlement in *Rodrigues*, here the Government presented only two contested pieces of evidence suggesting profit by Petitioner: evidence of cash deposits into her bank account and evidence of a discounted furniture purchase. At sentencing, the Court "frankly" observed that it could not make a determination if the cash deposits into Petitioner's account were the result of kickbacks from Rojas; the Court found that there was "no proof that she actually received [those kickbacks]." RT 8/14/06: Vol. II at 38-39. As for the discounted furniture, the Court did find profit by Petitioner as to a "de minimis" amount – but did so by preponderance of the evidence, not beyond a reasonable doubt. *Id.* at 38, 46. Finally, the Court also noted that Petitioner's theory that she was involved in the scheme out of altruism was "quite possible and supported" by argument and that the scheme likely began for the altruistic motives Petitioner described. *Id.* at 38, 40-41. Thus, the evidence that Petitioner received bribes or kickbacks for her participation in the scheme was hardly "unassailable," as in *Rodrigues*. The Court recognized this at sentencing, discussing the relative weakness of the evidence in detail. Thus, the Court cannot say beyond a reasonable doubt that the evidence supported finding that Petitioner received bribes or

kickbacks as part of her involvement in the scheme.

The Government disagrees, arguing that Petitioner cannot show that the instructional errors had a substantial and injurious effect on the jury's verdict.[7] Answer at 35. The Government maintains that the evidence of financial gain it presented "was no doubt critical" to the jury's assessment of the honest services fraud charges. *Id.* at 36. The Court finds this argument unpersuasive for two reasons. First, as discussed above, the evidence of financial gain by Petitioner was far from conclusive beyond a reasonable doubt. Second, it is difficult how to see this evidence was so "critical" given the instruction explicitly telling the jury that financial gain was not an element of the crime. Answer at 36. There was no jury finding regarding any benefits Petitioner may have received; the jury instructions allowed Petitioner to be convicted of honest services fraud even if she acted "out of friendship." RT 9/13/05: Vol. III at 106. Therefore, there is simply no way to tell what level of consideration the jury gave the evidence presented by the Government regarding financial gain by Petitioner. The Court thus cannot agree with the Government's assertion that this evidence "was no doubt critical" to the jury's verdict because that verdict was completely silent with respect to financial gain.

The Court further concludes beyond a reasonable doubt that the instructional error in this case had a "substantial and injurious effect" in determining the jury's verdict. *Brecht*, 507 U.S. at 623. As in *Rodrigues*, the jury instructions in this case omitted the requirement that the jury find beyond a reasonable doubt that the scheme involved bribes or kickbacks, an omission the Ninth Circuit found harmless in *Rodrigues* given the extensive indictment and "unassailable" evidence of kickbacks not present here. *Rodrigues*, — F.3d at —, *5. The instructions in this case, however, went beyond mere omission. Unlike *Rodrigues*, the jury in this case was explicitly instructed that "honest services" meant "the right . . . to have . . . employees conduct their assigned duties . . . without regard to conflicting interests of the employee or other persons." *See* Pet. Ex. B; RT 9/15/05: Vol. II at 111. This definition was offered by the Government – and given over Petitioner's objection – for the explicit purpose of clarifying the term "honest services." *See* RT 9/13/05: Vol. III at 102 (Prosecution: "I think it's helpful and instructive for the jury to hear from the Court what 'honest services' mean in general."). This conflict-of-interest theory of honest services fraud has since been explicitly disavowed by the Supreme Court. *See Skilling*, 130 S. Ct. at 2932 ("In light of the relative infrequency of conflict-of-interest prosecutions in comparison to bribery and kickback charges, and the intercircuit inconsistencies they produced, we conclude that a reasonable limiting construction of § 1346 must exclude this amorphous category of cases."). Giving this instruction on a conflict-of-interest theory was thus "plain error." *See*

---

[7]The Government also argues that, after *Skilling*, in order to convict a defendant of honest services fraud, it is unnecessary to prove that the defendant actually received a bribe because the federal bribery statutes criminalize the mere solicitation or demand of a bribe. *See* 18. U.S.C. § 666(a)(1)(B). Suffice it to say, Petitioner was not charged with this crime or any other bribery-related charge, nor was *any* evidence whatsoever presented by the Government suggesting that Petitioner demanded or solicited bribes.

*Black*, 130 S. Ct. at 2970; *United States v. Pelisamen*, 641 F.3d 399, 405 (9th Cir. 2011); *see also Martignoni*, 2011 WL 4834217, at *10 (granting coram nobis relief based on an improper conflict-of-interest theory instruction); *United States v. Panarella*, No. 00-655, 2011 WL 3273599, at *6 (E.D. Pa. Aug. 1, 2011) (granting coram nobis relief where, as here, "there is no dispute that [Petitioner] was charged solely with the undisclosed self-dealing theory that was invalidated by *Skilling*."). Therefore, the defective jury instructions in this case go beyond those in *Rodrigues*, where only an omission was at issue, because the instructions affirmatively and incorrectly defined honest services fraud, and that was the only definition given.[8]

Further, beyond omitting an element and improperly defining honest services fraud, the jury instructions in this case also relieved the Government of its burden of proof on the required bribes/kickbacks element because the instructions explicitly told the jury that they need not find financial gain by Petitioner in order to convict. *See* RT 9/13/05: Vol. III at 105 ("The Government is also not required to prove that the defendant personally secured any financial or monetary gain."). This instruction was given – again, over Petitioner's timely objection – because the Court's understanding of the law at the time reflected that construction. *See* RT 9/13/05: Vol. III at 105-07 (the Prosecution: "We don't have to prove monetary gain. . . . It makes certain that the jury is not misled as to what we do have to prove."; the Court: "It appears to me that you don't have to have a financial or monetary gain [to convict for honest services mail fraud]. You can commit the same crime simply out of friendship."). Post-*Skilling*, this view of the law is clearly erroneous, and this instruction was not at issue in *Rodrigues*, which dealt only with instructional omission. Instead of merely omitting the bribes/kickback element, the jury was explicitly instructed that it was unnecessary for conviction. Unlike *Rodrigues*, this error was not harmless, given the insufficient indictment and inconclusive evidence of bribes/kickbacks received by Petitioner.

Because the indictment did not allege that Petitioner received or solicited bribes or kickbacks, and because the evidence of financial gain by Petitioner was so contested, the Court cannot

---

[8]Petitioner's convictions are therefore not susceptible to the alternate instruction error standard of *Yates v. United States*, 354 U.S. 298 (1957), because there was only one, invalid, instruction given. Other cases have denied collateral relief under *Skilling* because an acceptable construction of honest services fraud was also presented to the jury. *See*, *e.g.*, *United States v. Spellissy*, 438 F. App'x 780, 783 (11th Cir. 2011) (no fundamental error because the jury instructions defined a bribe and kickbacks theory of honest services fraud); *Buckner v. United States*, Nos. 01-01104 PHX FJM, et al., 2011 WL 7498954, at *8 (D. Ariz. Dec. 2, 2011) (no fundamental error because the jury was instructed on both conflict-of-interest and money-or-property theories of honest services fraud, and the evidence was sufficient to convict under the acceptable theory). This is not the case here. The situation is more analogous to *Panarella*, *supra*, where coram nobis relief was warranted in part due to the singular, improper conflict-of-interest instruction. *See Panarella*, 2011 WL 3273599, at *6.

conclude beyond a reasonable doubt that, absent the instructional errors noted above, the jury would still have found beyond a reasonable doubt that Petitioner committed honest services mail fraud as defined in *Skilling*. The *Brecht* standard is therefore satisfied: the instructional errors omitting an element of the crime, incorrectly defining the term "honest services," and explicitly instructing that the jury need not find financial gain by Petitioner had a substantial and injurious effect in determining the jury's verdict because of the inconclusive evidence against Petitioner. *Brecht*, 507 U.S. at 623. This is a fundamental error justifying coram nobis relief.

## V. CONCLUSION

Petitioner warrants a writ of coram nobis. She has not defaulted her claims because she currently raises the same objection – instructional error – as she did at trial and on direct appeal. More importantly, she satisfies all four coram nobis requirements. First, she cannot obtain a more usual remedy because she is no longer in custody. Second, she could not have brought her collateral attack earlier because *Skilling* announced a fully retroactive change in the law by interpreting and substantively narrowing the scope of 18 U.S.C. § 1346. Third, she continues to suffer adverse consequences from her convictions because, under Ninth Circuit precedent, adverse collateral consequences irrefutably flow from criminal convictions and because those convictions will make it harder to be re-credentialed as a teacher in California. Finally, the error she complains of was fundamental because the jury instructions allowed her to be convicted for conduct that *Skilling* holds is not criminal, and because the evidence presented by the Government does not prove, beyond a reasonable doubt, that the jury would have convicted Petitioner of honest services mail fraud had it been properly instructed. Accordingly, the Court GRANTS Lorena Colino's Petition for Writ of Error Coram Nobis and VACATES and DISMISSES her eleven counts of conviction for honest services mail fraud.

The Clerk shall serve this minute order on all parties to the action.